## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JOHN ROSWELL,** | ) | Case No. 1:22-cv-02587-RDB |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM IN** |
| **v.** | ) | **SUPPORT OF MOTION FOR** |
| | ) | **PRELIMINARY INJUNCTION** |
| **CITY OF BALTIMORE et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

COMES NOW the Plaintiff, John Roswell, and, pursuant to Fed. R. Civ. P. 65, files this memorandum brief in support of his Motion for Preliminary Injunction.

# CONTENTS

TABLE OF CITATIONS ............................................................................................ iii

NATURE OF THE MATTER ..................................................................................... 1

QUESTION PRESENTED .......................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 1

ARGUMENT ............................................................................................................... 7

I.    ROSWELL SATISFIES THE STANDARD FOR A PRELIMINARY
      INJUNCTION ................................................................................................... 8

      A.    Roswell Will Likely Succeed on the Merits .................................................. 8

      B.    A Preliminary Injunction is Necessary Because Roswell is Suffering and Will
            Continue to Suffer Irreparable Harm ............................................................. 8

      C.    The Balance of Equities Necessitates Issuing a Preliminary Injunction .......... 9

      D.    A Preliminary Injunction is Necessary to Further the Interests of the Public  10

II.   ROSWELL IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS .... 10

      A.    Defendants' Regulations Are an Unconstitutional Restraint on Roswell's
            Protected Speech under the First Amendment and the Equal Protection Clause
            of the Fourteenth Amendment ...................................................................... 11

      B.    Defendants' Regulations Give Defendants Unfettered Discretion to Deny
            Roswell's Permit Application in Violation of the First Amendment. ............ 20

      C.    Defendants' Regulations Violate Roswell's Right to Due Process Because
            They Are Unduly Vague. .............................................................................. 22

      D.    Defendants' Regulations Are Unconstitutional Restraints on Roswell's Free
            Exercise of Religion ..................................................................................... 25

      E.    Defendants' Regulations Are Subject to Strict Scrutiny Because They Are
            Content-Based and Discriminate Based on Viewpoint .................................. 29

CONCLUSION ........................................................................................................... 31

## TABLE OF CITATIONS

*American Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601 (4th Cir. 2001) ...................................................................................................................12, 18

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .........................................................11

*Burson v. Freeman*, 504 U.S. 191 (1992) .............................................................11, 31

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) .....................11

*Child Evangelism Fellowship of MD, Inc. v. Montgomery County Public Schools*, 457 F.3d 376 (4th Cir. 2006)...................................................................................................20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).........25

*Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010) .............................29

*City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988).........................20–21

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) .................................12

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) .......................................................22

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ....................................10

*Elrod v. Burns*, 427 U.S. 347 (1976) ...............................................................................8

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990) .....................25

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ...................................7

*Grayned v. City of Rockford*, 408 U.S. 104 (1972).....................................................22, 24

*Hague v. CIO*, 307 U.S. 496 (1939) ...............................................................................11

*Joelner v. Vill. of Wash. Park*, 378 F.3d 613 (7th Cir. 2004) .........................................9

*Kolender v. Lawson*, 461 U.S. 352 (1983).....................................................................22

*Kunz v. People of State of New York*, 340 U.S. 290 (1951) ...........................................20

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ....................................8–10

*Mainstream Marketing Servs., Inc. v. Federal Trade Comm'n*, 358 F.3d 1228 (10th Cir. 2004)...............................................................................................17

*McCullen v. Coakley*, 573 U.S. 464 (2014) .......................................................11–14, 18–19, 28–30

*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981).........................................................28

*Murdock v. Pennsylvania*, 319 U.S. 105 (1943) ............................................................................17

*N. Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008).........................................16

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .........................................................................20, 28

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015).............................................................12–13

*Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819 (1995) ......................29

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002).....................................10

*Scott v. Bierman*, 429 F. App'x 225 (4th Cir. 2011)........................................................................7

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969) ......................................................................11

*Simon & Schuster, Inc. v. Members of N.Y. Crime Victims Bd.*, 502 U.S. 105 (1991).................17

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1 (1st Cir. 2012) ......................7

*Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250 (11th Cir. 2005) ...................................28

*Tandon v. Newsom*, 992 F.3d 916 (9th Cir. 2021).........................................................................25

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ....................................................................25–26, 28

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ....................................................................12

*Willson v. City of Bel-Nor, Missouri*, 924 F.3d 995 (8th Cir. 2019).............................................28

## NATURE OF THE MATTER

This case presents a constitutional challenge to Defendants' interpretation and application of certain regulations and permit requirements that infringe on John Roswell's First and Fourteenth Amendment rights.

## QUESTION PRESENTED

Whether a preliminary injunction should be issued prohibiting Defendants from enforcing certain regulations and rules to ban Roswell from using free-standing A-frame signs next to him while he is engaged in political and religious speech on a public sidewalk.

## STATEMENT OF FACTS

### A.      History of Dispute

Plaintiff John Roswell ("Roswell") is a trained sidewalk advocate supporting alternatives to abortion. *See* Ex. 1, Declaration of John Roswell ("*Roswell Decl.*") at ¶ 2.  For approximately the last five years, Roswell has peacefully exercised his First Amendment rights on the public sidewalk outside of an abortion facility owned and operated by Planned Parenthood of Maryland, Inc., located at 330 N. Howard Street in Baltimore ("Planned Parenthood"). *Id.* at ¶ 3; Ex. 3, *Real Property Data Search.*  Roswell's activities consist primarily of standing on the sidewalk near the facility to communicate alternatives to women considering abortions as they enter or exit the facility. Ex. 1, *Roswell Decl.* at ¶ 4.  Roswell presents information regarding abortion and its alternatives, as well as a visible demonstration of his deeply held religious conviction that human beings are being killed inside the facility. *Id.* at ¶ 5.  His religious conviction compels him to use every available effort to dissuade women from aborting their unborn children. *Id.* at ¶ 6.  Roswell seeks to do so in a kind and caring manner and attempts to establish a personal rapport with each woman he encounters. *Id.* at ¶ 6.

Over the years, Roswell has consistently relied upon using several stand-alone, A-frame signs to help him communicate this information. *Id.* at ¶ 7. The signs include statements such as "Abortion Hurts Women Here" and "Unborn Babies Are Human and Feel Pain" along with pictures of an unborn child in utero at 6 weeks and 9 weeks gestation. *Id.* at ¶ 7. Through years of using these and similar signs, Roswell has found that the signs effectively communicate his messages and beliefs without interfering with the personal, one-on-one discussions he believes he must have with women considering abortion. *Id.* at ¶ 8. The signs also allow him to communicate these messages while he hands out leaflets with additional information. *Id.* at ¶ 8. The signs are 30 inches wide, 34.5 inches tall, and 24 inches deep. *Id.* at ¶ 9; *see also* Ex. 6, *Citation Photographs.* Roswell's general practice was to place the signs in close proximity to the large planters outside the Planned Parenthood facility. Ex. 1, *Roswell Decl.* at ¶ 10. They take up no more space on the sidewalk than a person standing there would, and the signs do not prevent anyone from walking on the sidewalk as normal. *Id.* at ¶ 11. The sidewalk in question is not heavily trafficked, and Roswell has never encountered a situation where his signs caused congestion among pedestrians. *Id.* at ¶ 11. Roswell only displays the signs while he is present on the sidewalk and takes them with him when he leaves. *Id.* at ¶ 12.

Roswell has encountered severe reactions from the employees and volunteers working at the Planned Parenthood facility. *Id.* at ¶ 13. Employees and volunteers at the Planned Parenthood facility often verbally attacked Roswell. *Id.* at ¶ 13. Employees and volunteers at the abortion facility on numerous occasions have stepped immediately in front of Roswell, standing with their faces mere inches from his face, they have physically butted into him, and they have routinely attempted to provoke him, unsuccessfully, from his peaceful speech. *Id.* at ¶ 13. These employees

2

and volunteers at the facility on many occasions have called the police on Roswell. *Id.* at ¶ 14. The police have never indicated to Roswell that he was breaking any laws whatsoever. *Id.* at ¶ 14.

On or about January 22, 2020, Roswell was standing near the Planned Parenthood facility with several A-frame signs on the sidewalk near him. *Id.* at ¶ 15. Defendant Christopher Johnston, an inspector from the Baltimore City Department of Housing and Community Development, approached Roswell and told him that he needed a permit to place his signs on the sidewalk, and that placing the signs in this manner without a permit would result in a $500 fine per day. *Id.* at ¶ 15. (The relevant ordinances, regulations, and Defendants' processes prohibiting Roswell from, or requiring permits prior to, using the A-frame signs are collectively referred to herein as the "Regulations" or "Defendants' Regulations".)

After this warning, Roswell investigated the process for obtaining the necessary permits. *Id.* at ¶ 16. Roswell learned that to even apply for the permits, he had to either be the property owner or have the permission of the property owner. *Id.* at ¶ 16. He also learned of a host of other difficulties and costs involved in the process. *Id.* at ¶ 16. As such, Roswell knew it was virtually impossible for him to ever obtain the necessary permits. *Id.* at ¶ 16.

Roswell then, through counsel, wrote a detailed letter to the City of Baltimore stating his belief that the City, through its regulations and permit requirement, was violating his constitutional rights. *Id.* at ¶ 17. Roswell received no response. *Id.* at ¶ 17. Roswell notified the City he would begin placing his signs on the sidewalk again on July 6, 2020. *Id.* at ¶ 7. Again, Roswell received no response, so he returned with his signs on that date. *Id.* at ¶ 17.

On July 23, 2020, Defendant Christopher Johnston cited Roswell with Violation of Article 19, Section 45-2 of the Baltimore City Code. Ex. 5, *Citation*, p. 1. The violation listed on the citation was "Prohibited posting of signs on public property." *Id.* The citation carried a fine of

$500.00. *Id.* In the following photograph submitted by Defendant Johnston, Roswell's A-frame

signs are displayed on the left side of the sidewalk:



Ex. 6, *Citation Photographs*. (Roswell also placed several signs on the ground around a

city pole, which can be seen to the right in the above photograph. Signs placed around poles are

not the subject of this action.)

Roswell timely appealed this citation to the Environmental Control Board, as provided by

Baltimore City Code. Ex. 8, *Opinion*. At the hearing on Roswell's appeal, the City's witness

reiterated in her testimony that the A-frame signs violated the City Code and would be subject to

additional fines unless Roswell obtained the required permits. Ex. 8, *Opinion*, p. 2. Upon

reviewing the evidence, the hearing officer determined that Roswell had violated the City Code by

placing a sign on or around the City utility pole. *Id.* at p. 4; *see also* Ex. 6, *Citation Photographs*

(showing signs on or near utility pole on the right side of the photograph). The hearing officer

then reduced the fine from $500.00 to $10.00 and expressly declined to make any finding with

regard to the A-frame signs, stating "[t]his Hearing Officer makes no determination of the legality

of the remaining signs shown in the photographs." *Id.*

4

Roswell has not used A-frame signs on the sidewalks in front of the Planned Parenthood facility since the citation was issued. Ex. 1, *Roswell Decl.* at ¶ 19. Due to the stated regulations and the position taken by the City of Baltimore, Roswell is fearful of exercising his constitutionally protected rights of placing A-frame signs on the sidewalk near where he stands when speaking to people in front of the Planned Parenthood facility. *Id.* at ¶ 19.

**B.     Defendants' Regulations and Permit Requirements**

Defendants cited Roswell for violating Baltimore City Code, Article 19 (Police Ordinances) § 45-2. Ex. 5, *Citation*, p. 1; *see also* Ex. 8, *Opinion*, pp. 3–4 (discussing applicable law). Baltimore City Code, Article 19 (Police Ordinances) § 45-2 states: "No person may post, place, or affix a sign: . . . (6) on any other property owned, leased, or controlled by the City. . ." As suggested by its title "Postings prohibited", the ordinance operates as a complete ban on using signs on public sidewalks. However, under the Baltimore City Charter and enacted ordinances, Defendants allow certain persons or businesses owning property to place signs on city property in certain circumstances. Baltimore City Code, Art. 32, § 17 *et seq.* (zoning rights related to signs in the City of Baltimore); Ex. 2, *Minor Privilege Guide* (stating that property owners can obtain permits to use signs on adjacent public property). Under Defendants' regulations and procedures, anyone wishing to place a sign on a sidewalk must obtain two permits in order to use signs on the sidewalk: a right-of-way (or what is termed "Minor Privilege" permit) and a sign permit. Ex. 2, *Minor Privilege Guide*; Ex. 8, *Opinion*, p. 2; Ex. 9, *Emails*, p. 1; *see also* Baltimore City Charter, Art. VIII, § 2 (describing the minor privilege process generally). According to Defendants, one must first obtain the Minor Privilege Permit and then obtain a sign permit. Ex. 8, *Opinion*, p. 2; Ex. 9, *Emails*, p. 1.

The process for obtaining a Minor Privilege permit is laid out in a guide produced by the Baltimore Department of Transportation ("the Minor Privileges Guide"). Ex. 2, *Minor Privilege Guide*. According to the guide, A-frame signs "are permitted to be in front of the applicant's property only." *Id.* at p. 14. Under the Minor Privileges Permit process, Roswell must attest that he is the adjacent property owner. *Id.* at p. 1 (requiring signature of the adjacent property owner). There are no exceptions for non-property owners.

The minimum cost for obtaining a Minor Privilege Permit for signs less than 100 square feet is $70.30. Ex. 11, *Minor Privilege Permit Fee Schedule,* p. 8. It is unclear whether Roswell's cost would be per sign. Once submitted, the Minor Privilege permit application must be reviewed by no less than four different city departments that each have review times between three and six weeks. Ex. 4, *Application for Minor Privilege*, p. 2–3. Thereafter, the application must be approved by a Right of Way Services Division Chief, then the Department of Transportation Director, and then by the Board of Estimates, all in sequence. Ex. 4, *Application for Minor Privilege*, p. 3.

Once an applicant obtains a Minor Privilege permit, he or she must then obtain a sign permit, which must be approved by the Baltimore City Department of Housing & Community Development. Ex. 10, *Permit Application Portal.* The sign permit application, however, requires the applicant to attest to the following: "The undersigned hereby certifies under penalties of perjury that he/she is the owner of the subject property, or is the duly authorized agent of the owner with full and specific consent and authorization to act for the owner for this application." *Id.* The sign permit fee schedule charges $35 per sign. Ex. 12, *Sign Code Fees*, p. 3, §109.6.1(j) (showing that permits for signs "Over 10 sq. ft. (0.929 sq. m.) to 150 sq. ft. (13.94 sq. m.)" cost $35).

6

Throughout this process, Defendants have unfettered discretion to approve, deny, or obstruct an application. The "Minor Privilege" permit application itself states that the approving body "reserves the right, *in its discretion*, to terminate the privilege at any time. . ." Ex. 4, *Application for Minor Privilege*, p. 1 (emphasis supplied). Among the many other city officials who have the power to approve or deny the applications at each of the many stages, few if any have any clear guidelines to follow.

This discretion is particularly problematic considering the pervasive vagueness of Defendants' Regulations. Various documents made public by Defendants are plainly inconsistent as to whether A-frame signs are permitted at all. Assuming such signs are permitted at all, the available documents are hopelessly unclear in terms of the cost of each type of permit. *See* Section II.D. below.

## ARGUMENT

Roswell seeks a preliminary injunction prohibiting the enforcement of Defendants' Regulations against Roswell which prevent him from using A-frame signs on the public sidewalks outside the Planned Parenthood facility. The Fourth Circuit has described the four elements necessary to obtain a preliminary injunction as follows: "1) that the plaintiff is likely to succeed on the merits; 2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities weighs in the plaintiff's favor; and 4) that a preliminary injunction is in the public's interest." *Scott v. Bierman*, 429 F. App'x 225, 228–29 (4th Cir. 2011).

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012); *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002) (determination of irreparable harm in First Amendment case required analysis of likelihood

of success on the merits); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("When a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor."). As shown below, Roswell meets all four criteria and a preliminary injunction is warranted.

## I.     ROSWELL SATISFIES THE STANDARD FOR A PRELIMINARY INJUNCTION.

### A.     Roswell Will Likely Succeed on the Merits.

To determine the likelihood of success on the merits, the Court looks to the standards provided by the substantive law. *See, e.g., Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) (applying substantive law to determine a preliminary injunction was appropriate). The substantive law in this case is found in federal case law addressing the First and Fourteenth Amendments to the United States Constitution. The merits of this case are described in more detail in Section II below.

### B.     A Preliminary Injunction is Necessary Because Roswell is Suffering and Will Continue to Suffer Irreparable Harm.

To meet the second criterion for preliminary relief, Roswell must show a substantial likelihood that irreparable harm will occur if injunctive relief is not granted. It is well established that "[t]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Fourth Circuit has noted that where the threatened injury consists in "direct penalization, as opposed to incidental inhibition" of First Amendment rights, it cannot be "be remedied absent an injunction." *Legend Night Club*, 637 F.3d at 302 (internal quotation marks and citation omitted) (loss of right to engage in nude dancing to constitute irreparable injury; injunction issued).

Defendants have made it clear that Roswell cannot use the signs on the sidewalk without the two permits. Ex. 8, *Opinion*, p. 2; Ex. 9, *Emails*. Defendants have already cited Roswell once

8

for using the signs.  Ex. 5, *Citation*, p. 1.  Roswell is fearful that the City will prosecute him for using the signs without obtaining the permits, and has not used the signs since the citation was issued.  Ex. 1, *Roswell Decl.* at ¶ 19.  As such, Roswell satisfies the second element for injunctive relief.

**C.       The Balance of Equities Necessitates Issuing a Preliminary Injunction.**

Upon a finding of irreparable harm to Roswell, the next step is to balance the likelihood of irreparable harm to Roswell from the failure to grant interim relief against the likelihood of harm to Defendants from the grant of such relief.  *See Legend Night Club*, 637 F.3d at 302.  In this case, the likelihood of harm to Roswell greatly exceeds any potential for harm to Defendants.

Roswell seeks to exercise his First Amendment rights on the public right of way.  Denial of the injunction, then, would result in irreparable harm to Roswell.  On the other hand, if Defendants are restrained from enforcing and applying the laws in a manner infringing First Amendment rights, they will suffer no harm because the exercise of constitutionally protected expression can never harm any of Defendants' legitimate interests.  *See Legend Night Club*, 637 F.3d at 302–303 ("the State of Maryland is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions"); *accord, Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("it is always in the public interest to protect First Amendment liberties").  Importantly, here, the question at issue is whether Defendants can ban Roswell from displaying his signs without the permits, not whether he has an absolute right to display his signs in any manner. If Roswell were granted a preliminary injunction and then placed signs that obstructed traffic, or constituted a danger in any way, Defendants could still enforce other laws against Roswell.  (And there is no doubt Defendants will be duly notified of any violation by employees of Planned Parenthood.)  They simply could not require him to comply

9

with the onerous steps of obtaining a permit for the pendency of this suit. Thus, the "balance of hardships" tips decidedly in favor of Roswell.

**D.**    **A Preliminary Injunction is Necessary to Further the Interests of the Public.**

Given the irreparable injury to Roswell, the lack of any harm to Defendants' legitimate interests, and the critical nature of the First Amendment rights at issue, the public interest is best served by issuance of a preliminary injunction. "[U]pholding constitutional rights is in the public interest." *Legend Night Club.*, 637 F.3d at 303. *See also Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."). For these reasons, a preliminary injunction is warranted.

**II.    ROSWELL IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.**

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Fortuno*, 699 F.3d at 10; see also *Connection Distrib. Co.* at 288 ("When a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor."); *Carandola*, 303 F.3d at 511 (determination of irreparable harm in First Amendment case required analysis of likelihood of success on the merits). Roswell therefore now turns to a detailed consideration of the merits.

As discussed below, Defendants' Regulations unconstitutionally infringe on Roswell's First and Fourteenth Amendment rights. Without justification, the Regulations ban Roswell as a non-property owner from using signs on the public sidewalk, require Roswell to overcome seemingly endless bureaucratic hurdles and pay excessive fees, allow Defendants unfettered discretion as to whether to approve or deny permits and what cost to charge, impermissibly treat secular activities more favorably than Roswell's religious activities, and discriminate based on

speaker and viewpoint.  For all these reasons, Roswell is likely to succeed on the merits of his claim.

A.   **Defendants' Regulations Are an Unconstitutional Restraint on Roswell's Protected Speech under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.**

The First Amendment to the United States Constitution prohibits the enactment of laws "abridging the freedom of speech."  U.S. CONST., AMDT. 1.  This protection applies to anyone picketing, praying, leafleting, or speaking on the public right-of-way, as such public spaces "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Hague v. CIO*, 307 U.S. 496, 515 (1939).  City sidewalks are "quintessential public forums."  *Burson v. Freeman*, 504 U.S. 191, 196 (1992).  Accordingly, the government's ability to restrict speech in such locations is "very limited."  *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).

Requiring a permit before authorizing public speech has been held to be a prior restraint on speech.  *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–151 (1969) (holding that an ordinance requiring a permit before participating in a parade or procession was unconstitutional).  The Supreme Court has insisted that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (including string citation).  Put another way, the government's right to limit such activity is "sharply circumscribed."  *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995).

Assuming arguendo that the Defendants' Regulations are content neutral, the proper analytical standard is the time, place, and manner test. *See e.g., American Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 609 (4th Cir. 2001). "A content-neutral regulation of the time, place, and manner of speech is generally valid if it furthers a substantial government interest, is narrowly tailored to further that interest, and leaves open ample alternative channels of communication." *Id.* at 609 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Defendants' Regulations fail this standard because they are not narrowly tailored and do not leave open ample alternative channels of communication.

### 1.    Defendants' Restrictions Are Not Narrowly Tailored Because They Burden More Speech Than Necessary to Further Any Legitimate Interest.

"For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen*, 573 U.S. at 486 (*quoting Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). Although it "need not be the least restrictive means of serving the government's interests," the government still "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799. Importantly, after a plaintiff shows his speech is restricted by the government action, "the burden then falls on the government to prove the constitutionality of the speech restriction." *Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) (internal citation omitted). For a content-neutral regulation of speech to be valid, the government must demonstrate that alternative measures which burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier. *McCullen*, 573 U.S. at 495; *see also Reynolds*, 779 F.3d at 229 (holding that "intermediate scrutiny does indeed require the government to present actual evidence

12

supporting its assertion that a speech restriction does not burden substantially more speech than necessary.").

To apply intermediate scrutiny, the Court must first determine what government interests are involved in the restrictions. Baltimore City Code, Art. 32, § 17-101(c) expressly lists Defendants' purposes in its sign code. Ex. 7, *Sign Code*, pp. 355-56. The interests which apply to this case essential boil down to two purposes: providing safe operating conditions for pedestrian and vehicular traffic and maintaining an aesthetically attractive city. *Id.* With regard to the Minor Privilege permit, the Minor Privilege Guide states that the permit process "is intended to ensure the health and safety of the public as well as protect the City against damage to the streetscape, trees, sidewalks, streets, and other publicly owned property." Ex. 2, *Minor Privilege Guide*, p. 5. As discussed below, Defendants' Restrictions are not narrowly tailored to further any of these interests.

a.   Defendants Have Other Laws Which Serve the Same Interests Without Barring Roswell's Speech.

In *McCullen*, sidewalk counselors petitioned the Court to invalidate a Massachusetts law which created a buffer-zone around abortion facilities. 573 U.S. at 464. After finding that the law was content neutral, the Court turned to whether it was narrowly tailored, specifically, whether it burdened substantially more speech than necessary. *Id.* at 486. The Court acknowledged that the government had a legitimate interest in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services. *Id.* at 486–87. However, the buffer zone restriction imposed "serious burdens on petitioners' speech." *Id.* at 487. The Court noted that when the government

13

makes it more difficult to engage in "classic forms" of First Amendment speech, "it imposes an especially significant First Amendment burden." *Id.* at 489.

In light of the burden on the petitioner's speech, the *McCullen* Court looked to whether the buffer zone law burdened substantially more speech than necessary to achieve the government's asserted interests. *Id.* at 490. The Court observed that Massachusetts already had other laws prohibiting conduct such as harassment, intimidation, and deliberate obstruction of facility entrances, without barring all speech in the zone around the facility. *Id.* at 490–92. The Court then pointed to other state and federal laws which addressed the concerns that gave rise to the buffer zone law. *Id.* at 492. In particular, several laws— both already enacted and those Massachusetts could enact—allowed for injunctive relief, which "focuses on the precise individuals and the precise conduct causing a particular problem." *Id.* at 492. As the Court emphasized, Massachusetts had "available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 494. As such, the buffer zone restriction was not narrowly tailored. *Id.* at 496-497.

Here, Defendants cannot show that they "seriously undertook to address the problem with less intrusive tools readily available to it," as the *McCullen* holding requires. 573 U.S. at 494. Like the Commonwealth of Massachusetts in *McCullen*, Defendants have numerous ordinances already addressing safety concerns. There are police ordinances requiring that signs not "interfere with, impede, or hinder the free passage of pedestrian or vehicular traffic." Baltimore City Code, Art. 19, § 25-1(b)(1)(i); Ex. 13, *Police Ordinances-Public Places*, p. 1. The sign code already prohibits A-frame signs from interfering with pedestrian traffic or violating ADA accessibility standards. Baltimore City Code, Art. 32, § 17-401(b)(1). (Notably, Defendants did not cite Roswell with violations of either of these provisions. Ex. 5, *Citation*, p. 1.)

14

With regard to aesthetics, this concern, too, can be addressed by "less intrusive tools readily available" to Defendants. The only conceivable aspects of Defendants' Regulation that address aesthetics—at least in a constitutionally-allowed manner—would be limits on placement, size, and number of signs. There is no reason to believe such requirements could only be enforced against those with permits. As this case shows, Defendants have an ample system for prosecuting those who have never applied for or received any permits. Defendants could employ the same process for warning and citing those who post too many signs or too large of signs. This would avoid a blanket prior restraint on speech for non-property owners.

Defendants may argue that the permit process somehow ensures that signs meet aesthetic requirements, but this would not be supported by their Regulations. There are no publicly available criteria that Defendants use to ensure that signs are not an eyesore. Defendants cannot claim that a sign without permits is a greater eyesore than a sign with permits. Nor is there any reason to believe that persons owning property have a superior aesthetic eye for designing and using signs. Existing restrictions, or additional restrictions readily available to Defendants, address legitimate concerns about aesthetics just as well as the Regulations at issue in this case. Thus, despite having "less intrusive tools readily available" to them which accomplish the same purposes, Defendants insist on Regulations which do not just burden, but bar Roswell's speech. As such, the Regulations fail the narrowly tailored test.

     b.    Defendants' Regulations Are Overly Burdensome for Roswell to Satisfy.

As discussed above, Roswell cannot even apply for the permits because he does not own the adjacent property. Even if he somehow overcame this bar, Defendants' Regulations are overly burdensome for a speaker to temporarily place several A-frame signs next to him on a sidewalk while he engages in free speech. In a case involving North Carolina campaign finance restrictions,

the Fourth Circuit has recognized that "the Constitution makes clear that excessive regulation of political speech is suspect." *N. Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274, 296 (4th Cir. 2008). The *Leake* Court lamented that speakers attempting to comply with the restrictions in that case were "increasingly forced to navigate a maze of rules, sub-rules, and cross-references in order to do nothing more than project a basic political message." *Id.* Such restrictions "set out vague standards that empower administrators to burden core political expression and regulate beyond the periphery of any plausible state interest. . ." *Id.* at 296–97. For these reasons (among others), the Fourth Circuit held the North Carolina laws violated the First Amendment. *Id.* at 296–97.

The quotes above from *Leake* could be describing the permit process under Defendants' Regulations. According to Defendants' Minor Privileges Guide, the process to obtain a minor privilege involves twelve steps, which it describes over three pages. Ex. 2, *Minor Privilege Guide*, pp. 7–9. These steps include at least *seven* separate visits to government offices. *Id.* The Application for a Minor Privilege also lays out steps of the *same* application process, this time listing more than fifteen steps. Ex. 4, *Application for Minor Privilege*, pp. 2–3. Among these steps is the "review" by multiple different agencies, including the Department of Transportation, Police Department, Health Department, and Fire Department. *Id.* The application lists "review times for each agency" of between three and six weeks. *Id.* Assuming the agencies review the application concurrently, this step could take more than a month; if the reviews are consecutive, this step could last several months. Then, the application process only allows the applicant to proceed once all "reviews are completed and comments addressed," suggesting that any number of said agencies might raise some type of objection which an applicant must "address[]." *Id.* After that, the application is sent to the "Right of Way Services Division Chief for review" and thereafter sent to the "DOT Director" for "his signature." *Id.* The application is then placed on the "agenda"

for the Board of Estimates and must be "approved" by such Board. *Id.* All told, there are at least five different government bodies, not counting several other officials, which must "approve" applications for Minor Privileges alone. This is before even getting to the sign permit process.

Not only is the process arcane and difficult, but the permits themselves are also unconstitutionally costly. As the Tenth Circuit has held,

> [It is] well-established that the First Amendment protects against the imposition of charges, such as a [licensing fee or] tax[], for the enjoyment of free speech rights . . . [although] the government is permitted to exact a fee in order to defray the cost of legitimate regulations, even though such a fee incidentally burdens speech.

*Mainstream Marketing Servs., Inc. v. Federal Trade Comm'n*, 358 F.3d 1228, 1247 (10th Cir. 2004); see also *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (holding unconstitutional a law establishing a "financial disincentive to create or publish works with a particular content"); *Murdock v. Pennsylvania*, 319 U.S. 105, 113–14 (1943) (striking down a door-to-door licensing tax because it was "not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question" but instead "restrains in advance . . . constitutional liberties . . . and inevitably tends to suppress their exercise").

The Minor Privilege Permit fee schedule states that the minimum charge to obtain a Minor Privilege permit for signs less than 100 square feet is $70.30. Ex. 11, *Minor Privilege Permit Fee Schedule,* p 8. If such a permit fee was needed for each sign, that figure would be drastically higher for Roswell's multiple signs. Further, Roswell would need to obtain a sign permit as well, which according to Defendants' documents, appears to be $35 *per sign*. *See* Ex. 12, *Sign Code Fees*, p. 3; Building, Fire, and Related Codes of Baltimore City §109.6.1(j) (showing that a permit for signs "Over 10 sq. ft. (0.929 sq. m.) to 150 sq. ft. (13.94 sq. m.)" costs $35). Additional costs

apply for the "repairing, painting, and rehanging" of any sign, specifically, $25 per sign. *Id.* It is not clear that these charges would apply to Roswell, but if Roswell were seen as "rehanging" his signs every time he placed signs on the sidewalk, Defendants could charge him $25 *per sign per day* that he uses them. These factors combine to make Defendants' Regulations extraordinarily burdensome when applied to several signs placed near Roswell for a few hours while he is engaging in free speech on a public sidewalk.

Regardless of their goals, Defendants could employ a host of less intrusive options for signs accompanying speakers like Roswell. Defendant could enact regulations regarding size, number, and placement of signs *without* reference to the speaker. Such requirements could be enforced without the necessity for any permit at all. Without the requirement of the myriad of approvals, reviews, board meetings, and paperwork involved in the permit application process, there would be little to no cost to the city, so there would be no need for speakers like Roswell to pay anything. In light of the myriad of ways to accomplish Defendants' goals in less intrusive manners, it is clear that Defendants' Regulations are not "narrowly tailored" to further the Defendants' "legitimate interests." *See McCullen*, 573 U.S. at 466.

    c.    <u>Defendants' Restrictions Fail to Leave Open Ample Alternative Avenues of Communication.</u>

Beyond failing to be narrowly tailored, Defendants' Regulations also fail to leave open ample alternative avenues of communication, as required by intermediate scrutiny. *American Legion Post* 7, 239 F.3d at 609. In *McCullen*, the Court especially noted that the restrictions on speech "compromised petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" 573 U.S. at 487. The restrictions also made it harder for the counselors' ability to hand literature directly to patients. *Id.* at 488. In this case,

Defendants' Regulations cause the same types of difficulties for Roswell, without providing ample alternative avenues of communication.

Roswell uses A-frame signs so that he can communicate a written message and express his religious belief without wearing or holding a sign, which, in his experience, impairs conversation. Ex. 1, *Roswell Decl.* at ¶ 23–26. Much like the petitioners in *McCullen*, Roswell, too, wishes to engage in one of the most common and historically used methods of communication: signs. By placing signs in this way, he can display his beliefs and messages, while still being able to have one-on-one conversations with pedestrians and other persons in the area. *Id.* at ¶ 23–25. The signs not only convey messages but provide other people with notice of his willingness to engage in conversation related to the topics displayed on his signs. *Id.* at ¶ 24. In Roswell's experience, holding signs while attempting to converse or hand out information to persons in the area is obstructive and detrimental to his counseling mission. *Id.* at ¶ 23.

There is no ample alternative to placing A-frame signs that satisfies the above goals. Roswell can omit the signs, but this means that he fails to impart information he believes to be vital to women considering abortions. *Id.* at ¶ 23–26. Roswell has tried wearing his A-frame signs, but found it to be intimidating to those with whom he speaks. *Id.* at ¶ 23–24.

By preventing Roswell from using A-frame signs to present written information, the burdens on his speech have actually decreased his success in persuading women not to have abortions. *Id.* at ¶ 25. In other words, the restrictions have "clearly taken their toll," as did the restrictions in *McCullen*. 573 U.S. at 487. And by unduly burdening Roswell's chosen means of speech without providing ample alternative avenues of communication, the restrictions fail the time, place, and manner test. As such, Roswell is likely to succeed on his claim that Defendants' Regulations have violated his rights under the First and Fourteenth Amendments.

**B.**      **Defendants' Regulations Give Defendants Unfettered Discretion to Deny Roswell's Permit Application in Violation of the First Amendment.**

Defendants' Regulations are also unconstitutional because Defendants have unfettered discretion to grant, deny, or revoke the two permits. "The Supreme Court has long held that the government violates the First Amendment when it gives a public official unbounded discretion to decide which speakers may access a traditional public forum." *Child Evangelism Fellowship of MD, Inc. v. Montgomery County Public Schools*, 457 F.3d 376, 386 (4th Cir. 2006). "[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). This is important for two reasons. "First, [unbridled discretion's] existence, 'coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.'" *Child Evangelism*, 457 F.3d at 386 (*quoting City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988)). "Second, 'the absence of express standards' renders it difficult to differentiate between a legitimate denial of access and an 'illegitimate abuse of censorial power.'" *Id.* at 386 (*quoting City of Lakewood*, 486 U.S. at 758). Even if Defendants have not used their discretion to filter speech, "[i]nnocent motives do not eliminate the danger of censorship . . . as future government officials may one day wield such statutes to suppress disfavored speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 167 (2015).

The Supreme Court has long held that unfettered discretion invalidates requirements for speakers to obtain permits. In *Kunz v. People of State of New York*, the Supreme Court struck down an ordinance requiring a permit from the city police commissioner before holding public worship meetings, where the ordinance did not provide appropriate standards to guide the commissioner's decision. 340 U.S. 290 (1951). Similarly, in *City of Lakewood*, the Supreme

Court invalidated a city law that gave "no explicit limits on the mayor's discretion" to deny permits to place newsracks (or to require them to be placed in unfavorable locations). 486 U.S. at 769.

Here, there are many reasons to believe the permit process is almost wholly discretionary. The Application for Minor Privilege includes the phrase that, "It is further understood that the Board of Estimates reserves the right, *in its discretion*, to terminate the privilege at any time or to increase the charges for the privilege granted on thirty days' notice." Ex. 4, *Application for Minor Privilege*, p. 1 (*emphasis added*). A government entity which "reserves the right" to "terminate" a permit "in its discretion" would surely not balk at using its "discretion" to deny a permit in the first place, or, simply terminate a disfavored permit immediately upon approval.

Moreover, an application for a Minor Privilege permit involves review by multiple agencies, including the Department of Transportation, Police Department, Health Department, and Fire Department. *Id.* at pp. 2–3. These Departments do not appear to have rules or regulations as to approving Minor Privilege permits, yet the application process only allows the applicant to proceed once all "reviews are completed and comments addressed." *Id.* After that, the application is placed on the "agenda" for the Board of Estimates and must be "approved" by such Board— again, with no clear guidelines or regulations as to what permits should be approved. *Id.* The lack of guidelines makes Defendants' Regulations ripe for "illegitimate abuse of censorial power" by officials at more than half a dozen agencies, every one of which apparently has veto power over an application. *See City of Lakewood*, 486 U.S. at 758.

Defendants' unfettered discretion to filter out viewpoints they find offensive or not conducive to their particular interests violates the First Amendment, regardless of whether they actually do so. *Id.* at 757 ("unfettered discretion" violates the right to free speech "even if the

discretion and power are never actually abused."). As such, Roswell is likely to succeed on the merits of his claim.

**C.    Defendants' Regulations Violate Roswell's Right to Due Process Because They Are Unduly Vague.**

In addition to the constitutional problems described above, Defendants' Regulations are unduly vague, thereby violating Roswell's rights to due process. As far back as 1926, the U.S. Supreme Court stated that a law is constitutionally problematic when "men of common intelligence must necessarily guess at its meaning and differ as to its application . . . [such a law] violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).

The Supreme Court has said that a law must be sufficiently clear such that "ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). In *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972), the Court gave several particularly relevant reasons why the Constitution abhors unduly vague laws:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms, it 'operates to inhibit the exercise of those freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'

*(Internal citations omitted).*

Here, the most basic confusion arises from whether A-frames are even allowed in Baltimore. A brochure from the Baltimore City Department of Transportation entitled "Minor

22

Privilege Permit Program" states that "Certain items such as an A-Frame type sign or statues are not allowed." Ex. 14, *Minor Privilege Brochure*, p. 1. The fee schedule available on the Department of Transportation's website similarly states that "Easel 'A FRAME' or Standard Movable Signs" are "Not permitted per BOE [Board of Estimates]." Ex. 11, *Minor Privilege Permit Fee Schedule,* p. 8. However, the Minor Privileges Guide, linked to the same web page as the brochure and fee schedule document referenced above, says the opposite. Ex. 2, *Minor Privilege Guide*, p. 14. In fact, the Minor Privilege Guide admits that Defendants provide contradictory information. Under the "Frequently Asked Questions" section, Question No. 10 poses the following question, quoted below verbatim:

> Are A-frame signs allowed? I hear from one City Agency that they are not permitted at all, while another Agency tells me they are permitted, but just not in the public right-of-way. Moreover, a lot of businesses have them, which makes me think they MUST be permitted.

*Id.* The answer states, as mentioned above, that "A-frame or standard movable signs which are located in the public right-of-way are permitted to be in front of the applicant's property only." *Id.* Thus, Minor Privileges Guide itself admits that the permit application process, which is integral to Defendants' Regulations, is confusing and contradictory.

Not only is it unclear whether A-frame signs are allowed at all, but a speaker like Roswell can only guess at what the cost would be for a Minor Privilege Permit, because no price is listed on the fee schedule (which only states that such signs are not permitted). Ex. 11, *Minor Privilege Permit Fee Schedule,* p. 8. The costs for a sign permit are unclear as well, as there is no specific price for A-frame or moveable signs. Section 109.6.1(j) of the Building, Fire, and Related Codes of Baltimore City gives a price for signs "Over 10 sq. ft. (0.929 sq. m.) to 150 sq. ft. (13.94 sq. m.)." Ex. 12, *Sign Code Fees*, p. 3. As discussed above, it is unclear whether this fee applies to each sign or there is a single fee for multiple signs which, combined, have 150 square feet or less

of sign surface. There is also a sentence in Section 109.6.1(j) which states that "For repairing, painting, and rehanging any sign in the same place, the fee is $25 for each sign." *Id.* It is unclear whether Roswell would need to pay this fee every time he placed his signs (daily) or every time he changed them or repaired them. Ultimately, Defendants' Regulations cannot be anything but vague, when Defendants' own documents cannot agree whether A-frame signs are even allowed, let alone state a price for the necessary permits.

The many remaining steps of the application process entail more vagueness. As discussed above, the Minor Privilege Permit must be approved by no less than five government bodies, and the sign permit must be approved by the Baltimore City Department of Housing & Community Development. Ex. 4, *Application for Minor Privilege*, p. 2–3; Ex. 10, *Permit Application Portal*. There are virtually no objective standards to approve or reject such applications and the Application for Minor Privilege envisions that departments might "comment" on the application and such comments must be "addressed." Ex. 4, *Application for Minor Privilege*, p. 3.

The many areas of serious vagueness described above offend all three principles referenced above from *Grayned*. Because of their vagueness, Defendants' Regulations do not provide speakers with "a reasonable opportunity to know what is prohibited"—or allowed. *See Grayned*, 408 U.S. at 105. Between the two permits, the Regulations "impermissibly delegate[] basic policy matters" to countless officials from at least six different government bodies "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* Finally, because the vague Regulations "abut[] upon sensitive areas of basic First Amendment freedoms"—namely, the ability to engage in speech on a historically public forum—they "inhibit the exercise of those freedoms." *Id.* The vague Regulations "inevitably lead citizens to steer far" from possible violations, and indeed, from even applying for a permit when one can

24

only guess whether such a permit would be approved or what the costs might be. Because the Regulations are unduly vague, Roswell is likely to succeed on the merits of this claim.

**D.    Defendants' Regulations Are Unconstitutional Restraints on Roswell's Free Exercise of Religion.**

Defendants' Regulations also violate Roswell's First Amendment rights to free exercise of religion. Because Defendants' Regulations treat comparable secular signs more favorably than his religious expression, they must be subject to strict scrutiny. And as Defendants' Regulations fail intermediate scrutiny (*see* Section II.A.1. above), it is no surprise that they fall hopelessly short of satisfying strict scrutiny.

**1.    Defendants' Restrictions Are Subject to Strict Scrutiny.**

Generally, a law does not violate an individual's free exercise of religion so long as it is neutral and generally applicable. *See Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 881–82 (1990); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). However, if a regulation treats "*any* comparable secular activity more favorably than religious exercise," then it is not "generally applicable" and will be subject to strict scrutiny. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original).

In *Tandon*, individuals wishing to hold at-home religious services challenged state COVID-19 restrictions which limited private indoor "gatherings" to three households. The petitioners argued that the restriction was not "generally applicable" because they did not apply to comparable activities outside of residences. *Tandon v. Newsom*, 992 F.3d 916, 920 (9th Cir. 2021). The federal District Court and Ninth Circuit Court of Appeals rejected that argument, holding that restrictions equally burdened "analogous secular in-home private gatherings," and thus the law was "generally applicable." *Id.*

25

However, the Supreme Court reversed and held the California regulation was subject to strict scrutiny. *Tandon*, 141 S. Ct. at 1296. The Court stated that strict scrutiny is triggered when regulations "treat *any* comparable secular activity more favorably than religious exercise." *Id.* (emphasis in original). Further, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*

California's interest in its regulations, the Court observed, was to limit the spread of COVID-19. *Id.* So the question was whether permitted secular activities in public buildings posed comparable risks of COVID-19 transmission as prohibited in-home gatherings. *Id.* Under this analysis, the Court agreed with the petitioners that many activities in public buildings were comparable to in-home gatherings, including "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants." *Id.* at 1297. These activities were "comparable" because they posed the comparable risks of COVID-19 transmission as in-home activities. *Id.* Because the regulation treated secular activities more favorably than comparative in-home religious activities, it triggered strict scrutiny. *Id.*

Here, Defendants' interests are essentially safety and aesthetics. With regard to these interests, Defendants' Regulations treat many types of comparable secular signs more favorably than Roswell's religious exercise. Most basically, Planned Parenthood could apply for permits for A-frame signs in the same location as Roswell's signs, with the same degree of distraction and obstruction, and the same effect on aesthetics, as Roswell's signs. Yet, Planned Parenthood would have the possibility of those permits being granted, because it is the owner of the building. Similarly, a secular abortion advocacy group with Planned Parenthood's consent could seek a

permit to use signs on the very sidewalk Roswell wishes to use. Certainly, this is a more favorable treatment.

On the face of Defendants' Regulations, they favor several other types of secular activities over Roswell's religious exercise. For example, under the sign code, signs used exclusively for advertising the sale or lease of property can be larger in size than Roswell's signs and carry no cost at all. Ex. 12, *Sign Code Fees*, p. 3. The sale or lease sign can be up to 99 square feet, whereas Roswell's signs are each approximately 15 square feet. Ex. 1, *Roswell Decl.* at ¶ 9; Ex. 12, *Sign Code Fees*, p. 3. Moreover, no sign permit is even required for the sale or lease signs. Ex. 12, *Sign Code Fees*, p. 3. A "for rent" sign on a building is no doubt a "comparable" activity to a religious sign on the sidewalk a few feet away, when considering its propensity to distract drivers or clutter landscapes. Nevertheless, such a sign would be free and would not require any permit, but Roswell faces insurmountable difficulty and cost for his religious expressions.

Yet another instance of a comparable secular activities does not involve signs but planters on a public sidewalk. As the Minor Privilege Guide states of planters:

> Smaller, movable planters do not require a Minor Privilege Permit. All planters must be placed against the wall of the property at all times. To determine whether or not a particular planter requires a Minor Privilege Permit, use a two feet rule of thumb. Planters greater than two feet in any dimension will typically require a Minor Privilege Permit.

Ex. 2, *Minor Privilege Guide*, p. 12. Planters can affect safety and aesthetics in the same way as Roswell's signs, especially as they create similar obstructions to sidewalk traffic. Indeed, Roswell typically placed several of his signs right next to planters on the sidewalk near Planned Parenthood to minimize obstruction to pedestrians. Ex. 1, *Roswell Decl.* at ¶ 10. Yet Roswell needed two permits for his signs, even though the planters a few inches away required no permits at all.

These are only a few of the many examples of secular activities which are comparable because of their effect on aesthetics and safety, yet which are treated more favorably than

27

Roswell's religious expression.   Under the rule set forth by the *Tandon* Court, Defendants'

Regulations must therefore be subject to strict scrutiny.

### 2.   Defendants' Regulations Fail Strict Scrutiny.

Under strict scrutiny, Defendants' Regulations are presumed to be invalid unless

Defendants prove they are the "least restrictive means of achieving a compelling state interest."

*McCullen*, 573 U.S. at 478.   This is a high standard, and, as shown below, Defendants' Regulations

fall hopelessly short.

To apply strict scrutiny, the court must identify the government interests involved in the

restriction.   Defendants' interests in their Regulations are described in Section II.A.1., and can be

distilled into interests of traffic and pedestrian safety and aesthetics.

As an initial matter, Defendants' interests are not compelling interests to justify a complete

ban or discriminatory prohibition on Roswell's rights.   *See, e.g., Willson v. City of Bel-Nor,*

*Missouri*, 924 F.3d 995, 1001 (8th Cir. 2019) ("Bel-Nor argues the Ordinance is justified by traffic

safety and aesthetics. These interests here are not compelling."); *Solantic, LLC v. City of Neptune*

*Beach*, 410 F.3d 1250, 1267 (11th Cir. 2005) ("the sign code is not narrowly tailored to accomplish

the City's asserted interests in aesthetics and traffic safety, nor has our case law recognized those

interests as "compelling."); *see also Reed*, 576 U.S. at 171 (stating the Court would assume "for

the sake of argument" that the interests were compelling but declining to rule on that issue because

restrictions were hopelessly underinclusive).   At the very least, it is hard to imagine that aesthetics

can form the basis of a compelling government interest when compared with First Amendment

rights.   As the Supreme Court has observed, "esthetic judgments are necessarily subjective,

defying objective evaluation." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 510 (1981).

It is axiomatic that an ugly or offensive sign is no less protected by the First Amendment than

visually pleasing artwork.

Moreover, Defendants' Regulations are far from the least restrictive means of achieving those interests. As described at length in Section II.A.1., above, Defendants' Regulations are not narrowly tailored, which is the standard for intermediate scrutiny. If they are not narrowly tailored, they certainly are not the least restrictive means of furthering the government's interest, as required by strict scrutiny. As such, the Regulations fail strict scrutiny and thus violate Roswell's free exercise of religion.

**E.     Defendants' Regulations Are Subject to Strict Scrutiny Because They Are Content-Based and Discriminate Based on Viewpoint.**

Government regulation is also subject to strict scrutiny if it "distinguish[es] among different speakers, allowing speech by some but not others." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010); *see also Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 828 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."). Here, Defendants' Regulations allow the use of A-frames by building owners, but not by anyone else. Therefore, under *Citizens United*, the Regulations are subject to strict scrutiny.

Strict scrutiny similarly applies to restrictions which discriminate based on viewpoint. *See McCullen*, 573 U.S. at 482–84. In *McCullen*, the Supreme Court held that a law providing a "buffer zone" around abortion facilities was content neutral, even though it exempted facility workers. *Id.* at 482–83. However, the Court recognized that if the abortion workers were allowed to speak about abortion within the buffer zone, but sidewalk counselors were not, such a law "would then facilitate speech on only one side of the abortion debate—a clear form of viewpoint discrimination . . ." *Id.* at 483.

29

Here, as applied to Roswell's free speech, Defendants' Regulations constitute viewpoint discrimination.[1] Roswell's audience is located on the sidewalk in front of the entity to which the speech is opposed. This is the most relevant place for those who oppose abortion to speak publicly and share their beliefs with those considering abortions. The Supreme Court has recognized this particular characteristic of sidewalk counselors. *See, e.g., McCullen,* 573 U.S. at 487 (holding that the buffer zone restriction "compromised petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling'"). However, the discrimination based on property ownership means that abortion facilities always have a favored status, with an additional avenue of speech not available to those opposed to abortion. It does not matter whether Planned Parenthood applies for a permit for an A-frame sign—the fact that the option is open to it and not to Roswell is sufficient. *McCullen,* 573 U.S. at 508 (Scalia, J., concurring) ("[A] statute that forbids one side but not the other to convey its message does not become viewpoint neutral simply because the favored side chooses voluntarily to abstain from activity that the statute permits.").

Roswell and Planned Parenthood represent different viewpoints on an important question in our society. To allow Planned Parenthood to be the gatekeeper of Roswell's First Amendment rights on the public sidewalk is contrary to the heart of the Constitution. *See, e.g., Niemotko v. Maryland,* 340 U.S. 268, 272 (1951) ("The right to equal protection of the laws, in the exercise of

---

[1] The Supreme Court recently clarified Free Speech content-based analysis in *City of Austin v. Reagan National Advertising of Austin, LLC,* 596 U.S., No. 20-1029, slip op. (2022). That case considered whether regulations which distinguished between on-premises and off-premises billboards were content based. The Court, recognizing that cities across the nation have been regulating on-/off-premise signs for half a century, held that the regulation was content-neutral because the analysis was based solely on the location of the sign, which was "similar to ordinary time, place, or manner restrictions." *Id.,* slip op. at 8, 12. The Court did not address discrimination based on speaker or viewpoint, and thus does not absolve Defendants' Regulations.

those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body."). This type of discrimination between speakers defeats the principle that sidewalks are "quintessential public forums." *See Burson*, 504 U.S. at 196.

Because the Regulations discriminate based on speaker and viewpoint (as applied to Roswell), they are subject to strict scrutiny. And as discussed in the previous section, Defendants' Regulations fail strict scrutiny.

## CONCLUSION

Defendants' Regulations go constitutionally awry in the very name of one of the two permits required: a "Minor Privilege Permit." Defendants indeed treat Roswell's speech as a "privilege," to be granted or denied at their pleasure and discretion, only after Roswell satisfies whatever procedural hurdles they wish to impose. However, free speech is not a "privilege" but a right under the First Amendment to the United States Constitution. Defendants' Regulations, because they fail to recognize this, must be enjoined.

Roswell has satisfied all the criteria necessary for entry of a preliminary injunction. Roswell is likely to succeed on the merits, he is suffering irreparable harm, the balance of harms favors him, and the public interest would be served by entry of the injunction. Accordingly, the Court should grant Roswell's motion, enjoin Defendants from enforcing their Regulations in a way to prohibit Roswell from placing A-frame signs near him while he engages in free speech on public sidewalks.

DATED this 10th day of October, 2022.

JOHN ROSWELL, Plaintiff,

BY:     /S/ Cameron E. Guenzel
        Nebraska Bar No. 24405*
        JOHNSON, FLODMAN,
        GUENZEL & WIDGER
        1227 Lincoln Mall
        Lincoln, NE 68508-2847
        Phone: (402) 475-4240
        Fax: (402) 475-0329
        cguenzel@johnsonflodman.com

        /S/ Matthew F. Heffron
        Nebraska Bar No. 19225*
        THOMAS MORE SOCIETY
        10506 Burt Circle/ Suite 110
        Omaha, Nebraska 68114
        Phone: (402) 952-5415
        Fax: (312) 782-1887
        mheffron@thomasmoresociety.org

        AND

        /S/ J. CALVIN JENKINS, JR.
        Federal Bar No. 00306
        409 Washington Avenue, Suite 610
        Towson, MD 21204
        CPF#: 7512010152
        Phone: (410) 296-6822
        Fax: (410) 825-7913
        jcjenkins@baltimorecountylaw.com

        * Pending admission pro hac vice